UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SEALED

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No. 17cr10026 |
| v. ) | |
| ) | 18 U.S.C. § 1349 – Conspiracy to |
| AREF SAID, ) | Commit Wire Fraud |
| a/k/a ALEX DIAMANTI, ) | 18 U.S.C. § 1343 – Wire Fraud |
| ) | 18 U.S.C. § 981(a)(1)(C) and |
| Defendant ) | 28 U.S.C. § 2461(c) – Wire Fraud |
| ) | Forfeiture Allegation |

**Indictment**

The Grand Jury charges that:

At times material to this indictment:

1. The defendant, AREF SAID, was a Belgian citizen residing outside the United States. SAID traveled to the United States, often staying in or traveling through Massachusetts. SAID also used the name ALEX DIAMANTI.

2. Co-Conspirator 1 ("CC-1") was a Spanish citizen residing in Belgium. CC-1 traveled to the United States, often staying in or traveling through Massachusetts. CC-1 also used the names Daniel Dennis Homard Hendrickx (or simply Daniel Hendrickx) and Antoine Gerard Nourrain (or simply Antoine Nourrain).

**The Scheme to Defraud**

3. Beginning no later than March 2013 and continuing until at least February 2016, SAID and CC-1, together with others known and unknown to the grand jury, engaged in, attempted to engage in, and conspired to engage in a scheme to defraud law firms and non-profit institutions, including charities, using false pretenses and fraudulent checks. In many instances, victims of the fraud were induced to send money to

bank accounts in or around the Boston metropolitan area, where it was withdrawn by a member of the conspiracy.

4. CC-1, among other things, opened bank accounts into which victims were persuaded to transfer their money, withdrew victim money from those accounts, and distributed that money to other members of the conspiracy. CC-1 also communicated to SAID account details for bank accounts that CC-1 opened in various names, including false ones.

5. SAID, among other things, transmitted information among members of the conspiracy, including CC-1. Those transmittals included notifying members of the conspiracy when, from whom, and into what accounts victim money should arrive.

### Objectives of the Scheme to Defraud and of the Conspiracy

6. One of the purposes and objectives of the scheme to defraud and of the conspiracy was to fraudulently obtain money and property by deceiving law firms into forwarding money to a member of the conspiracy by convincing the firms they had received money belonging to a client, when in fact they had received a fraudulent cashier's check.

7. Another purpose and objective of the scheme to defraud and of the conspiracy was to fraudulently obtain money and property by deceiving charities and other non-profit institutions into sending money to a member of the conspiracy by convincing the institutions they had received an erroneously large donation, when in fact they had received a fraudulent cashier's check.

### Manner and Means

8. In general, the scheme operated using one of two fraudulent strategies:

a. Using an alias, a member of the conspiracy contacted a law firm posing as a potential client—generally a British architectural firm—that was purportedly seeking assistance collecting a debt from a person located near the law firm. Before the firm had taken substantial steps to collect the debt, however, it received in the mail what appeared to be a cashier's check from the purported debtor in the full amount of the debt. Thereafter, the conspirator/purported client asked the firm to deposit the check, retain its fee, and forward the remainder of the check's purported value to one or more individuals who were either co-conspirators or aliases for co-conspirators. In fact, the purported cashier's check was a forgery, as the firm learned after it had forwarded money to SAID or one of his co-conspirators.

b. Using an alias, a member of the conspiracy contacted a non-profit organization claiming that he wished to provide a donation of a specified amount. Thereafter, the organization received in the mail what appeared to be a cashier's check from the supposed donor, but in excess of the promised amount. The arrival of the check was followed by a communication from the conspirator/supposed donor asserting that the extra donation had been made in error and requesting that the balance of the check's purported value be sent to one or more individuals that the donor identified. Those individuals were either co-conspirators or aliases for co-conspirators. In fact, the purported cashier's check was a forgery, and the donation never occurred.

9. Over its life, the scheme targeted hundreds of law firms and non-profits, including charities devoted to the assistance of people with disabilities or mental illness; survivors of violence and sexual assault; education of the underprivileged; and to the protection of animals and the environment.

### Acts in Furtherance of the Scheme to Defraud and the Conspiracy

10. On various dates beginning no later than March 2013 and continuing until at least February 2016, SAID, CC-1, and others known and unknown to the grand jury committed the following overt acts, among others, in furtherance of the conspiracy and scheme to defraud:

11. One or more conspirators sent e-mails to law firms in which the sender purported to be an architect who was owed money by a client local to the recipient organization. Afterward, one or more conspirators, including CC-1, mailed fraudulent checks to law firms that had received the e-mail solicitations, disguising those checks as payments from the supposed debtors for the benefit of the purported architect, but made out to the law firms. The recipients of such e-mails and cashier's checks included Law Firm 1 (a law firm in Los Angeles, California), Law Firm 2 (a law firm in Ogden, Utah), Law Firm 3 (another law firm in Los Angeles, California), Law Firm 4 (a law firm in Pace, Florida), and Law Firm 5 (a law firm in Santa Clara, California).

12. One or more conspirators sent e-mails to charities and other non-profit organizations in which the sender purported to be a potential donor. Afterward, one or more conspirators, including CC-1, mailed fraudulent checks to organizations that had received the e-mail solicitations, disguising those checks as donations from the supposed donors. The recipients of such e-mails and cashier's checks included a charity in Mercer

Island, Washington, dedicated to providing education to disadvantaged children ("the Charity").

13. One or more conspirators directed law firms, charities, and other non-profits that had received fraudulent checks to deposit the checks and transfer a portion of the money to bank accounts belonging to one or more members of the conspiracy, including CC-1 and SAID, either in their own names or the names of their aliases, including but not limited to Hendrickx, Nourrain, and DIAMANTI.

14. After the organizations had transferred the money as directed, one or more members of the conspiracy, including CC-1, withdrew the money from the designated bank accounts from locations including bank branches and automatic teller machines in the District of Massachusetts.

15. On or about May 28, 2014, among other occasions, SAID instructed CC-1 to withdraw money from bank accounts controlled by CC-1 into which victim money had been deposited.

16. On or about October 29, 2014, SAID asked CC-1 for an address at which SAID could receive mail, and CC-1 provided one. On various dates beginning no later than on or about November 4, 2013 and continuing until at least February 2016, SAID and CC-1 used the address, or variations on it, to open and maintain bank accounts into which victim money was deposited.

17. On or about January 10, 2016, among other occasions, SAID, CC-1, and other members of the conspiracy, in some combination, discussed how to divide proceeds among themselves and other co-conspirators.

18. On or about various dates including but not limited to July 29, 2014, March 16, 2015, July 9, 2015, and September 18, 2015, CC-1 communicated to SAID and other conspirators account details for bank accounts that CC-1 opened in various names, including Hendrickx and Nourrain.

19. On or about various dates including but not limited to March 25, 2013, March 21, 2014, November 7, 2014, January 12, 2015, and January 15, 2015, SAID and CC-1 opened bank accounts in their own names and in the names of aliases.

20. In one transaction typical of the scheme, on or about January 12, 2015, as part of the scheme, a member of the conspiracy sent an e-mail to an attorney at Law Firm 4. The e-mail purported to come from someone calling himself a British architect. In subsequent exchanges with Law Firm 4, the purported architect claimed to be owed money for work he had performed for a client in Miami, Florida. Law Firm 4 agreed to help collect the debt.

21. On or about April 24, 2015, Law Firm 4 received in the mail what appeared to be a cashier's check for $97,588 made out to Law Firm 4, ostensibly by the supposed Miami client for the benefit of the British architect. Unbeknownst to Law Firm 4, the check was fraudulent.

22. On or about April 27, 2015, a member of the conspiracy directed Law Firm 4 to wire $92,588 to a Bank of America account in the name of Daniel Hendrickx controlled by CC-1. On or about the same date, Law Firm 4 transferred the money as directed, and SAID alerted CC-1 that the money had been deposited. Between on or about April 27 and April 28, 2015, CC-1 withdrew approximately $45,200 from the Bank of America account at

various locations in Massachusetts and wired another $40,000 from the account to the bank account of an associate in Belgium.

23. In another typical example, on or about December 29, 2015, as part of the scheme, a member of the conspiracy sent an e-mail to the Charity. The e-mail purported to come from someone calling himself a British architect. In subsequent exchanges with the Charity, the purported architect expressed a desire to donate $30,000 to the Charity in honor of his mother.

24. On or about January 14, 2016, the Charity received in the mail what appeared to be a cashier's check for $39,850 made out to the Charity, ostensibly from the British architect. Unbeknownst to the Charity, the check was fraudulent.

25. On or about January 14, 2016, a member of the conspiracy sent the Charity an e-mail purporting to come from the architect claiming that the cashier's check had been issued in an erroneously high amount. According to the architect, the excess money was needed to fulfill a pledge the architect had made to a family whose daughter was scheduled for surgery the coming weekend. On or about January 15, 2016, a conspiracy member sent the Charity another e-mail, this one claiming that the family's daughter "ha[d] a life threatening situation and ha[d] been hoping on funding for the past three months." In the e-mail, the conspiracy member, again posing as the British architect, directed the Charity to wire the excess money to a TD Bank account in the name of Daniel Hendrickx controlled by CC-1. The Charity wired the money as directed.

26. On or about January 19, 2016, CC-1 withdrew $9,930 from the TD Bank account, including through withdrawals made at automatic teller machines in Weymouth and Quincy, Massachusetts.

## Count One

### (Conspiracy to Commit Wire Fraud – 18 U.S.C. § 1349)

27. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 26 of this Indictment and further charges that in or about and between March 2013 and February 2016, in the District of Massachusetts and elsewhere, the defendant,

**AREF SAID,**
**a/k/a ALEX DIAMANTI,**

together with others known and unknown to the Grand Jury, conspired with CC-1 to commit wire fraud, in violation of 18 U.S.C. § 1343, to wit: having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing that scheme, namely deceiving law firms and non-profits into transferring money to one or more bank accounts belonging to members of the conspiracy on the basis of false representations that the money either belonged to a law firm's client or was sent to a non-profit in error by a donor.

All in violation of 18 U.S.C. § 1349.

## Counts Two – Eight

## (Wire Fraud – 18 U.S.C. § 1343)

28. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 26 of this Indictment and further charges that, on or about the dates listed below, in the District of Massachusetts and elsewhere, the defendant,

**AREF SAID,**
**a/k/a ALEX DIAMANTI,**

together with others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, and attempting to do so, as set forth below:

| Count | Date | Wire |
|---|---|---|
| 2 | 11/5/14 | Transfer of $46,588 from an account in name of Law Firm 1 to Eastern Bank account number xxxxxx3543 in the name of CC-1, together with associated notices, account updates, and acknowledgements |
| 3 | 5/27/14 | Transfer of $47,000 from a Utah IOLTA (Interest On Lawyer Trust Accounts) account belonging to Law Firm 2 to a Bank of America account number xxxx xxxx 2721 in the name of CC-1, together with associated notices, account updates, and acknowledgements |
| 4 | 5/27/14 | Transfer of $45,558 from a Utah IOLTA account belonging to Law Firm 2 to an East Boston Savings Bank account number xxxxxx1356 in the name of CC-1, together with associated notices, account updates, and acknowledgements |
| 5 | 1/9/15 | Transfer of $97,500 from an account in the name of Law Firm 3 to a Citizens Bank account number xxxxxx-368-6 in the name of ALEX DIAMANTI, together with associated notices, account updates, and acknowledgements |

9

| | | |
|---|---|---|
| **6** | 4/27/15 | Transfer of $92,588 from a Florida IOTA account (Interest On Trust Account) belonging to Law Firm 4 to a Bank of America account number xxxx xxxx 1450 in the name of Daniel Dennis Homard Hendrickx, together with associated notices, account updates, and acknowledgements |
| **7** | 2/1/16 | Transfer of $97,035 from an account in the name of Law Firm 5 to a Citizens Bank account number xxxxxx-933-5 in the name of Antoine Gerard Nourrain, together with associated notices, account updates, and acknowledgements |
| **8** | 1/15/16 | Transfer of $9,850 from an account in the name of the Charity to a TD Bank account number xxx-xxx9567 in the name of Daniel Hendrickx, together with associated notices, account updates, and acknowledgements. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## Wire Fraud Forfeiture Allegation

## (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

29. Upon conviction of one or more of the offense in violation of Title 18, United States Code, Sections 1349 and 1343, set forth in Counts One through Eight of this Indictment, the defendant,

**AREF SAID,
a/k/a ALEX DIAMANTI**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

30. If any of the property described in Paragraph 30, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the Court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 30 above. All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL,

_____
FOREPERSON OF THE GRAND JURY


_____
BRIAN PÉREZ-DAPLE
Assistant U.S. Attorney

DISTRICT OF MASSACHUSETTS, February 1, 2017


Returned into the District Court by the Grand Jury Foreperson and filed.

_____
Deputy Clerk

2/1/17

11:24 am

12